## PEARSE, survivor, &c. *vs.* PETTIS.

Where, upon an agreement for the sale and purchase of property, possession
has been obtained by the purchasers, by means of fraudulent representations
as to their solvency and responsibility to pay for the same; and it appears
that the purchasers have realized from the use of the property more than
they have paid on account of the purchase money; the vendor may disaffirm
the contract of sale, and reclaim the property, in the hands of a subsequent
purchaser with notice of the fraud; without restoring, or offering to restore,
to the original purchasers the amount paid, and the securities given by them
· at the time of making the purchase.  ROSEKRANS, J. dissented.

Such subsequent purchaser, when sued for refusing to deliver up to the vendor
his property thus fraudulently obtained, can not set up as a defense, that the
plaintiff has failed to perform his duties or obligations to the original pur-
chasers, by returning the purchase money paid.

He is in no condition to raise that question. It can only arise in an action
between the parties to the original contract.  .

Where a fraudulent vendee is still in possession of the property, the vendor
may give notice of disaffirmance to *him*, return to him the purchase money
received at the time of the sale, and demand of him a restoration of the
property; but if the vendee has parted with the property before disaffirm-
ance, there is nothing to be done by the vendor towards the person in pos-
session—especially if his possession is *mala fide*—except to demand of him
the possession of the property.

The rule that if nothing has been received by the vendor, towards the pur-
chase money, notice of his election to rescind the contract, with demand of
the property, is sufficient to entitle him to reclaim it of any person who may
have it in possession, applies between the vendor and the fraudulent holder
under a fraudulent vendee.  In such a case, the person in possession having
paid nothing to the vendor, the latter has nothing to restore to him.

When the perpetrator of a fraud has used a small amount of his own means as
one of the instruments with which to effect his purpose, and by such means
has secured to himself, from his victim, a larger amount, which he is unable
to restore, the defrauded party is not bound, as a condition precedent to his
right to disaffirm and rescind the contract, to restore what he has received,
on his part, while the perpetrator of the fraud is holding a larger amount of
his ill-gotten gains, secured by the same contract.

THIS case is upon appeal from a judgment in favor of the
plaintiff, on a verdict at the circuit, held in the county
of Saratoga.   The plaintiff, as the survivor of his brother,
brings this action to recover a canal boat, alleged to have
been obtained from the plaintiff and his brother, in June,

1858, by Flanders & Perry, upon fraudulent representations as to their solvency or responsibility to pay for the boat. The plaintiff claimed the right to disaffirm or rescind the contract, on the ground of the fraud in obtaining it. The boat was called the "Sarah Paddock." One Jerome Paddock, by virtue of some lien upon the boat, against Perry & Flanders, sold and purchased in said boat on such lien, and afterwards sold the same to one Buel P. Barnes. Buel P. Barnes sold the same to the defendant, William B. Pettis. The plaintiff's theory was that all these transfers were made with full knowledge that the boat had been fraudulently obtained of him, and that the defendant Pettis being totally insolvent, the plaintiff demanded the boat of him, and on his refusal to deliver it up, the plaintiff replevied the boat.

There was evidence on the trial that Pearse, the vendor, was unacquainted with Perry & Flanders, the vendees, and was introduced to them on the day of the negotiation of the boat. Perry & Flanders resided in the western part of the state, and Pearse in Saratoga county, and had no personal knowledge of their responsibility. It was proved that they represented to Pearse that they had no money to pay down, but had plenty of other property; that they had a farm in Medina, worth between $13,000 and $14,000; that they paid down in cash, on the purchase, between $4000 and $5000; that there was now remaining on it only an incumbrance of $5000, by way of mortgage. That they owned three canal boats, nearly paid for, sixteen horses, worth $100 each, paid for, six spans of them used on their boats, and two of them on the Medina farm. That Perry, one of the firm, owned a house in the village of Medina, worth $2000, which was not incumbered. The plaintiff then agreed to sell them the boat in question for $2200, and take a mortgage on the Medina farm for $1000, as security for that sum. Three hundred dollars was paid down, and notes for the remainder of the whole purchase money taken, payable at long periods

of time. It was also proved on the trial, that the Medina farm of one hundred and forty acres was worth but $60 per acre—$8400. That there were two mortgages on it, prior to the plaintiff's mortgage, amounting to $9500. That the house and lot in Medina village was not owned by Perry, but the title was in the name of his wife, and that but $126 had ever been paid on that; that a part of those horses they pretended to have, were owned by a firm of Cowen & Clark. That this boat, which they purchased in June, they mortgaged in July for $600, and later in the season for $2800. The plaintiff's disaffirmance and demand was not made till more than one year after the sale. This delay the plaintiff attempted to excuse, by the want of earlier information as to the certainty of the fraud, and the difficulty of finding the boat, and its pretended owner, to make the demand. The plaintiff made no offer to return the consideration he received on the sale, nor the notes unpaid, before he replevied the boat. The value of the use of the boat was variously estimated by witnesses, from $150 per month to $2500 a year. The value of the boat at the time of commencing the action, was about $1600. The question of fraudulent representations, and of the *bona fides* of the several purchasers through whose hands the boat passed, was submitted to the jury; no exception being taken to the charge. The jury found their verdict upon the following questions submitted to them by the court, to wit:

1st. Did Perry & Flanders obtain from the plaintiff the canal boat Sarah Paddock, by means of fraudulent representations?

2d. Had Jerome Paddock, at the time he caused the boat to be sold, sufficient reason to believe that the said boat had been fraudulently obtained?

3d. Had Buel P. Barnes, at the time he purchased the boat, sufficient reason to believe that the said boat had been obtained by fraud, by Perry & Flanders?

4th. Had William B. Pettis, at the time he purchased the boat, sufficient reason to believe that the said boat had been obtained by fraud, by Perry & Flanders ?

The jury answered all these questions in the affirmative, and thereupon the court directed a general verdict for the plaintiff.

Several questions of law, upon the ruling of the judge, appear in the case, which will sufficiently appear in the opinion.

*E. F. Bullard*, for the plaintiff.

*Henry Smith*, for the defendant.

POTTER, J. I do not propose to discuss the points raised by the defendant, that the finding of the jury, upon each of the questions submitted to them, was against evidence, or against the weight of evidence. There was *some* evidence upon each of the questions so passed upon by the jury, tending to prove those issues, as found by them, and there being no point made, that the evidence was not legally admitted, the verdict upon the question of fraud, and the good faith of the respective vendees, at the time of their purchases, can not be disturbed, as those questions are exclusively for the jury.

An important point of law was raised at the trial, on the motion to nonsuit, and is now again presented, viz : that the plaintiff could not disaffirm the contract and reclaim the property, even if fraudulently obtained, without restoring to Perry & Flanders what had been received of them on the contract, or at least making the offer to do so. Certain leading facts in the case may here be briefly stated. When Perry & Flanders, in June, 1858, agreed to purchase this boat, they paid down $300, and had never after that paid any thing, of principal or of interest. They had the use of the boat that season, and until the month of July, 1859 ; the use of

the boat was proved to be worth from $150 per month, in the boating season, to $2500 a year; and it was injured in its use, so as to be of the value of $1600 when replevied.    None of the notes falling due had been paid; Perry & Flanders having been shown to be insolvent, and the boat, sold from them on account of their insolvency, was then in the hands of an insolvent proprietor, and the mortgage given upon the real estate was worthless.    Then this point is urged, that notwithstanding this condition of things, before the plaintiff can recover against Pettis, the defendant, the plaintiff is bound to tender back·to Perry & Flanders the $300 paid by them when the boat was obtained, and also return their mortgage given on the real estate, and the notes given, then due, and to become due.

Assuming, for the purpose of the argument, that a perfect disaffirmance of the contract requires of the plaintiff all. that is here insisted on, it will hardly be contended — indeed it was not so contended on the argument in this case — that the plaintiff was bound to make any such tender to Pettis, the defendant, the insolvent·possessor of this boat, who purchased it with knowledge of the fraud by which it was obtained of the plaintiff.    Pettis, it is conceded, had no right or interest in the money paid by Perry & Flanders·on the purchase, nor in the notes and obligations given by them.    The tender of these to Pettis, would not only be an idle and nugatory formality on the part of the plaintiff, but wrong and hazardous towards the vendees.    The defendant is therefore in no condition to raise this question.    That is a question that could only arise, had the action been between the plaintiff as vendor; and Perry & Flanders as vendees.    It is the vendees, if any body, that are entitled to a return of their money and obligations, not the defendant; and as the vendees are not parties to this action, their rights to these notes, mortgages and money can not be determined in it; nor can the defendant set up in his defense, when sued for refusing to

Pearse *v.* Pettis.

deliver to the plaintiff his boat, so fraudulently obtained, that the plaintiff has failed to perform his duties or obligations to another, and a third person. This is no defense to this action, on the part of Pettis. It is contended that a complete rescision of the contract requires two distinct acts to be performed: 1st. Notice of disaffirmance and demand of the property ; and 2d. A restoration of the property received by the vendor from the vendee at the time of the sale. If this be true, and the vendee has parted with the possession, these two acts must be performed to different parties. The demand of possession must be made of the person in possession and the restoration of the money which was paid at the sale, must be made to the immediate vendee. If the immediate vendee is still in possession, it is true, both these acts may be performed to him, and at the same time ; but where he has parted with the property before disaffirmance, they can not. In such case, there is nothing to be done by the vendor towards the person in possession, especially if his possession, as in this case, was *mala fide*, but to demand of him the possession of the property so tortiously held by him ; and it does not then lie in the mouth of such tortious possessor to insist, that before he is bound to surrender his ill-gotten estate, the defrauded owner shall restore to every other tort feasor in the line of successive torts, what may happen to be the technical rights of such other wrong doers. As between the vendor, and a subsequent purchaser in possession, from a fraudulent vendee, all that can or need be done by way of disaffirmance, is to give the notice and make the demand. It is absurd to say that the disaffirming vendor, in addition to giving notice, and making his demand of the holder, is bound to show, and satisfy such fraudulent possessor, that he, the vendor, has been doing justice to all others along the line of this tortious track of conveyances, and to each preceding tort feasor. Each fraudulent actor in this line, is to be dealt with severally, according to his rights and interests

in the matter; their several rights and interests are not dependent upon each other, and I know of no principle of law that justifies, or authorizes, one wrong doer to set up. and insist upon it as a defense, that justice has not been done to another wrong doer.

If we are right in this view, (still continuing the theory of the defendant, that the vendor is in all cases bound to restore all that he has received on the contract,) we have shown, as I think, that he is bound only to restore it to the person of whom he received it. Under this theory, it ·may be conceded that if the immediate vendee was in possession of the property,· both these acts—notice of disaffirmance demand of the property, and a return, or offer to return, the money, obligations, or other things received on the sale— would, as a general rule, be conditions precedent, if not to the bringing of the action, at least the notice of rescision and demand of property, must be ˙made before action, and the money and obligations received, be produced, returned, or canceled on the trial. (*Stevens* v. *Hyde*, 32 *Barb.* 171.) This case, which was well considered, and is the most recent· one, holds, "that the election by the vendor to rescind, when distinctly and definitely made, cancels, and puts an end to the contract, *in toto*, and restores the vendor to his original title as general owner of the property; and leaves the parties in their original position in respect to title." This election, I think, is distinctly made by the notice of disaffirmance and demand of property. The same case holds, further, that "if nothing has been received by the vendor, towards the purchase money, notice of his election to rescind the contract, with demand of the property, is sufficient to entitle him to reclaim it of any person who may have it in possession." This rule, if not general, clearly applies, between the *vendor* and the fraudulent holder under a fraudulent vendee; which is this case. The vendor has nothing to restore to him; he has paid nothing. The disaffirmance as to him is perfect.

The case above cited had not been published at the time of this trial, but the doctrines it contains, as far as they apply, are the same that I ruled on the trial. I held that a tender to Pettis, of the notes and mortgage given by the vendees on the pretended sale, was idle and nugatory, and that their production on the trial, with an offer to return and cancel them, even if the vendors were parties, would be sufficient. I now think that as Perry & Flanders were not parties to the action, nor within the power of the court to receive or obey its order, the tender of these papers in court was, so far as regards the parties to that action, also useless and ineffective, the court not being the custodian of them. As was said in *Stevens* v. *Austin*, (1 *Metc.* 558,) by Shaw, Ch. J. in a case like the present, in many of its features, " The defendant could not raise the question whether the plaintiff had made restoration to his immediate grantees or not. It was *res inter alios*, with which the defendant had no concern, and it was wholly irrelative between the parties." But it is still urged that, notwithstanding the plaintiff was not bound to tender to the defendant, Pettis, either the money paid by Flanders & Perry on the sale, or to restore, before or at the trial in this action, the notes and obligations given on the purchase, yet that such restoration and return is so much a part of the act of rescision that the disaffirmance is imperfect until it is done, and that the onus is on the plaintiff to prove it has been done. The cases of *Stevens* v. *Hyde*, (*supra;*) *Thurston* v. *Blanchard*, (22 *Pick.* 18;) *Stevens* v. *Austin*, (1 *Metc.* 558;) *Ladd* v. *Moore*, (3 *Sandf.* 589,) unite in holding that this is not a condition precedent to the right to bring the action. If, therefore, it is necessary to be done at all, it is sufficient that it be done on the trial. But suppose we are mistaken in this, and that there is no distinction in the rule as to the restoration, between the immediate vendee and a subsequent holder ; then, I think, upon principle as well as upon authority, even where the action is between the immediate parties to the con-

tract, that the rule is not universal that the property received, at the time of making the contract, must be restored to the vendee before or at the trial. Though I concede it to be the general rule, there must of necessity be exceptions. The general rule applies, doubtless, to a class of cases, such as executory contracts, and perhaps to some others.

Perhaps no better case than this can be found to discuss the universality of the rule claimed by the defendant, upon principle. The finding of the jury, upon the issues, that the property was obtained from the plaintiff by means of fraudulent representations, and that this fraud was known to all the subsequent vendees, including the defendant, leaves the case precisely as if Perry & Flanders were the defendants, (except as to the question of tender back of the money and papers obtained at the sale.) The plaintiff had received in actual value $300. Perry & Flanders had received the use of the boat for a part of two seasons, and had reduced it in value some $600; or in other words, the use of it to them greatly exceeded that sum. By means of a fraud committed upon the plaintiff, they had received, in value, from his property, several hundred dollars exceeding the amount they had left with him. With such pecuniary advantages in their favor, obtained by a successful fraud, and they utterly insolvent and unable to make it good, it is claimed that the plaintiff can not disaffirm, until he shall allow these fraudulent vendees $300, which had been used by them as one of the instruments in committing the fraud, while they are in the possession of a much larger amount of his means. The law, in relation to the rescision of a contract tainted with fraud, should stand upon rational principles, and I know of no reason why a basis of justice and equity should be repudiated, or why the perpetrator of a fraud should be entitled to immunity from the controlling principles that lie at the foundation of all moral rule, in order that some obsolete technicality, without reason for its support, shall stand for a *universal*

*rule,* when common reason and common sense require that, like every other rule, it shall yield to *exceptions,* demanded by the soundest principles of natural justice.   I only claim for this case, that it comes within the exceptions, to wit, that when the perpetrator of a fraud has used a small. amount of his own means as one of the instruments with which to effect his purpose, and by such means has secured to himself, from his victim, a larger amount, which he is unable to restore, the defrauded party is not in such case bound, as a condition precedent to his right to disaffirm and rescind the contract, to restore what he has received, on his part, while the perpetrator of the fraud is holding a larger amount of his ill-gotten gains, secured by the same contract.

Cowen, J. in *Voorhees* v. *Earl,* (2 *Hill,* 293,) speaking of the authorities cited to establish the general rule, says : " Those authorities do not relate to the case of a *fraudulent,* and therefore avoidable sale."   " They are cases of either a fair sale, or of an executory contract to sell either the entire thing and a continuance in possession by the vendee, or several things at an entire price, the vendee retaining possession of a part."   And he further adds, " that even in the case of a fair sale, the rule is not universal."   In *Masson* v. *Bovet,* (1 *Denio,* 74,) Beardsley, J. in speaking of the same general rule, says : " It was established, not on account of any feeling of partiality or regard for the fraudulent party ; the law cares very little what his loss may be, and exacts nothing for his sake. If, therefore, he has so entangled himself in the meshes of his own knavish plot, that the party defrauded can not unloose him, the fault is his own."   In the case of *Ladd* v. *Moore,* (3 *Sand. S. C. R.* 592,) the court says : " It is undoubtedly true, as a general rule, that a party who would disaffirm a contract must return whatever he has received upon it."   " But surely, (they add,) this must be upon the condition that the party returning shall thus restore himself to his own original position, else in case of fraud, the party committing the fraud

might, as in this case, place himself in a situation that he could not restore, and yet the injured party shall have no redress, through a proceeding to arrest the person of the defendant, unless he restores all that he has received, and obtains nothing in return but a judgment, which in a majority of instances proves worthless." This extract, it appears to me, in its spirit, opens a golden mine of good sense that should not be overlooked for a senseless technicality. That case was made an exception to the rule, and for reasons that I approve.

It is a rule, as old as the principles of morality, that courts will not aid a fraudulent party to carry out his schemes. The law which stamps such a transaction as fraudulent, is in its very spirit intended to restrain the wrong doer, and protect the innocent sufferer ; and the courts will never so far recognize the fraudulent contract as having binding efficacy in favor of the offender, as to deprive the injured party of his remedy, for want of any technical compliance, on his part, with the fraudulent agreement. The rules that are appropriately applied to cases of fair dealing, will not be so applied to cases that are shown to be offenses against the laws of morality, of social order and of public policy. As Lord Mansfield said in *Montefiori* v. *Montefiori*, (1 *W. Black. R.* 364,) "no man shall set up his own iniquity, as a defense, any more than as a cause of action." The judgment should be affirmed.

BOCKES, J. concurred.

ROSEKRANS, J. dissented.

Judgment affirmed.

[ST. LAWRENCE GENERAL TERM, October 2, 1866. *Rosekrans, Potter* and *Bockes,* Justices.]